THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PERRY SAUNDERS, Defendant-Appellant.

(No. 57325; )

First District (3rd Division)—February 21, 1974.

James J. Doherty, Public Defender, of Chicago (Lebert D. Bastianoni and Michael Weininger, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Alan Brothers and Kenneth L. Gillis, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

The defendant, Perry Saunders, was tried without a jury and found guilty of murdering David Watts and Dinard Watts. He was sentenced to the penitentiary to a term not less than 30 nor more than 90 years for each homicide. At his trial Saunders admitted killing the Watts brothers but pleaded self-defense. On appeal he contends that the State failed to prove beyond a reasonable doubt that he was not acting in self-defense, that evidence was improperly excluded concerning his state of mind, and that at the most he committed voluntary manslaughter, not murder.

The double killing occurred about 9 P.M. on August 26, 1971, in the apartment of Annie Long at 6314 South Ellis Avenue, Chicago. People gathered in the apartment during the afternoon and evening, drinking, playing cards and rolling dice. Saunders and the Watts brothers were among them. There had been an argument between Saunders and David Watts on August 4, 1971. Two days later Saunders was shot in the back and he suspected that one of the brothers had done the shooting. However, they drank and shot craps together on August 26 and there were no words between them.

In one of the dice games, James Rush told the other players that he was taking house cuts for Annie Long. David Watts argued about paying the cut and threatened to kill Rush. The argument was settled and the two men left the apartment and went around the corner to have a drink. Later, Saunders also left. He and James Rush returned to the apartment about 9 P.M., went into the kitchen and resumed their drinking. Ten or fifteen minutes later, David and his brother returned.

Saunders testified that he was sitting on a stool in the kitchen when he heard some sounds in the hallway. He looked up and saw David and his brother coming down the hallway "kind of fast" and saw a gun in David's hand. He said that he thought they were coming to kill him so he pulled a gun from his belt and started firing. David and Dinard Watts fell to the floor. Saunders kept firing until his gun was empty. He then reloaded and started for the front door. He said that as he was going out he saw David rise up; he shot him again, took the gun from David's hand and went home.

The police went to his home that night and asked for him and Rush. Saunders' wife said neither one was there. The police instructed her to tell her husband to get in touch with them. He did not do so. He and Rush were arrested the next day by two policemen who were riding in an unmarked squad car. They were charged with murder.

They were tried together. At the conclusion of the State's evidence, the trial court granted Rush's motion for a finding of not guilty. Rush was called as a defense witness. He testified that David Watts was armed. He said he saw David take a pistol from his pocket earlier in the day and that it was raised in his hand that night when he ran down the hallway toward the kitchen. Rush testified that he turned his back until the volley of shots was over. He said that Saunders re-loaded his gun; that David, who was on the floor, raised his, and Saunders shot him again. Rush said that Saunders took the gun from David's hand, but he was not sure whether Saunders did this before or after shooting David a second time.

Joyce Griffin, Annie Long's daughter, testified for the defendant. She said that as she was leaving the apartment about a quarter to 9, she saw David and Dinard Watts standing at the front door and heard Dinard say, "[G]et your gun man, get your gun out."

Another defense witness was Evelyn Williams, who testified that she was playing cards when the shooting took place. She took refuge under the card table and when the shooting ended went out the back door. She said that as she passed David's body, she saw a gun in his hand.

Rogers Hall was playing cards in the living room at the time Saunders and Rush, and David and Dinard Watts re-entered the apartment. He testified that the latter two said hello to everyone and were laughing and talking as they walked toward the kitchen. About the time they reached the kitchen, Hall heard rapid firing. He thought there were six shots, probably more. He and his fellow card-players went underneath the card table. When he got up, Saunders and Rush came into the room. He saw a pistol in Saunders' hand and heard one of the men say, "[G]et out of here and don't say nothing." Hall testified that Dinard's body

was in the hallway and no weapons were around it. David's body was in the kitchen near the back door. There were no weapons near it. The only weapon Hall saw in the apartment that night was the one in Saunder's hand.

A pathologist for the Coroner of Cook County examined the bodies. He testified that David's body had five bullets in it, Dinard's three. One bullet had entered the top of David's head, one his back and another the side of his chest toward the back. A fourth bullet had entered his chest and a fifth had entered the chest and went sharply downward. Based on the paths of two of these bullets, the pathologist was of the opinion that the barrel of the gun that fired the shots was above the head of the victim.

During his testimony Saunders related that 22 days before he killed the Watts brothers he had a mild argument with David Watts in which David said he was lucky to be in the neighborhood, because if David did not want him around he would not be. His attorney asked him what he took this statement to mean. An objection was made and sustained. Two days after the argument he was shot twice in the back shoulder. Later he was present when Dinard said to a third person, "You all think you're smart. We done got one of them." His attorney again asked what he took this to mean. In sustaining an objection the court said, "I will let what was said in, not what he's thinking." The exclusion of the defendant's thoughts on these two occasions is claimed to be reversible error.

■■ The case was tried without a jury, and the court's rulings are said to indicate that the court was not concerned with what the defendant thought and, therefore, would not consider his mental state at the time he shot the Watts brothers. This objection is farfetched. The crucial issue in a self-defense case is not what the accused may have thought 10 to 20 days before the homicide, but what was in his mind at that time. Saunders was permitted to testify freely about his thoughts, his fears and the reasons for them at the time the brothers were in the hallway. He said he saw a pistol in David's hand, thought they were going to kill him or try to kill him, so he pulled out his gun and started firing. He said he fired the weapon because Dinard had told him one of them had shot him and he was scared one of them was going to kill him. He was permitted to relate prior incidents, quarrels and threats which were pertinent to his plea of self-defense. The exclusion of his mental impressions at the time the earlier statements were made to him or overheard by him, did not prejudice him and was not error. The disallowance of this testimony did not indicate that the court had closed its mind to the defendant's pertinent testimony.

■■ A person who kills a human being without lawful justification

commits murder if he either intends or does great bodily harm to that person. (Ill. Rev. Stat. 1969, ch. 38, par. 9—1(1).) An intent to kill does not necessarily constitute an intent to murder; a person may intentionally kill if the killing is in self-defense, and not be guilty of murder. But the use of force intended or likely to cause death is justified only when the person reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or to prevent the commission of a forcible felony. Ill. Rev. Stat. 1969, ch. 38, par. 7—1.

■■ ■ Self-defense is an affirmative defense and, once it is raised by a defendant, the State must prove his guilt beyond a reasonable doubt on this issue as well as on the other elements of murder. (Ill. Rev. Stat. 1969, ch. 38, par. 7—14, par. 3—2(a), (b); *People v. Johnson* (1969), 112 Ill.App.2d 148, 251 N.E.2d 393.) Whether a killing is justified under the law of self-defense is a question of fact to be determined by the judge or jury that tries the case. After the trier of fact has made its finding, this court will not set it aside unless it is palpably contrary to the evidence, or if the State's evidence is so unsatisfactory that it raises a reasonable doubt of the defendant's guilt. *People v. Brooks* (1964), 52 Ill.App.2d 473, 202 N.E.2d 265.

■■ The State's evidence was sufficient to sustain the trial court's finding that Saunders committed two murders. It was the court's responsibility to determine the credibility of the witnesses and the weight to be given their testimony. The court did not have to believe Saunders and those witnesses who said David Watts was armed with a gun. While it was not necessary for him to have been armed to support Saunders' plea of self-defense, the testimonial conflict about the gun and the lack of any physical evidence concerning it, reflects upon the credibility of those who said he had one.

The gun was never produced nor its absence explained. Saunders said he took it with him when he left the apartment. His witness, Evelyn Williams, who never told the police that she had been in the apartment, testified that when the shooting ended she walked into the kitchen and saw the gun in Watts' hand. Saunders' friend, James Rush, who admitted lying to the police, testified that Dinard Watts, whom no one accused of being armed, came down the hall first. He was shot in the ribs, arm and neck and fell in the hallway. Yet his brother David, who was behind him and supposedly out to get Saunders with a gun raised to shoot, did not fire a shot in defense of his brother. In fact, no shots were alleged to have been fired from that gun although the defendant and two witnesses said it was in his hand.

Although Saunders may have had prior trouble with the Watts

brothers, he had none the day of the shooting. He had seen them almost every day after the trouble. There were no attempts to harm him during those encounters. The evidence shows no reason why he should have believed he was in danger the day they died. He and they gambled together and drank together before he killed them. One had threatened Rush, but neither had threatened him. They were friendly and jovial seconds before they met their deaths.

There was evidence that tended to prove that Saunders' action was calculated and deliberate. He did not stay in the apartment or call the police. He did not report the shooting to them. He did not communicate with them when word was left for him to do so. He fled from the scene and had to be apprehended. Upon his arrest, he did not tell the police the story he related in the courtroom. He not only said nothing about having shot David and Dinard Watts, but denied knowing what happened in the apartment.

A .38 caliber revolver was on the front seat of the auto Saunders was driving at the time of his arrest. Ten discharged bullets were found in the kitchen and in the bodies of the victims. Six empty casings were also recovered. It was stipulated that all were fired from the revolver found in the auto.

Saunders admitted that he shot six times, removed the six spent shells, reloaded his revolver and fired some more. These were not the actions of a man who shoots just to protect himself. That his killings were without lawful justification is further shown by the way he shot David Watts: in the back, near the back and through the top of his head.

The court was fully justified in discounting the testimony of Saunders and his witnesses. From the evidence the court could have believed that Saunders sought revenge against the brothers, armed himself for this purpose, sat in the kitchen waiting for them to come in and killed them in cold blood.

■■ The contention that the killings were at most voluntary manslaughters is untenable. A defendant is guilty of voluntary manslaughter if, in taking an individual's life, he believes he is in danger of losing his own life or suffering great bodily harm, but his belief is unreasonable. (Ill. Rev. Stat. 1969, ch. 38, par. 9—2(b); *People v. Lockett* (1967), 85 Ill.App.2d 410, 229 N.E.2d 386.) Implicit in the trial court's decision that Saunders was guilty of murder was the finding that his life was not in danger and that he did not believe it was.

The judgment is affirmed.

Affirmed.

McNAMARA, P. J., and McGLOON, J., concur.